Jesse Valdez here on behalf of the appellants. I also have the other attorneys here for me for the estate of William Langfitt and I'd like to reserve three minutes for rebuttal. We are here today to request the reversal of the district court's granting of summary judgment to the appellees on when there were material issues of dispute and when there were material facts in dispute. We believe the court disregarded the declarations of Naomi Powers which were in conflict and the court also disregarded some of the underlying facts of the other statements. What are the, in your mind, the major essential questions of material fact that were inappropriately, in your view, resolved in the way that the court did? Well first, that Mr. William Langfitt, I'll call him Billy, was armed. Our argument is he was unarmed. He had no weapon. The physical evidence says that. Miss Naomi Powers in her declaration says that. Another witness, also Miss Black, says he was unarmed. The other issue that we have is warnings officers or Deputy Edwards claims he made orders. None of the witnesses, Mr. Taylor, Mr. Black, Mrs. Black, Mrs. Powers, say we never heard any orders. There was no orders given. They didn't say there were no orders. They said they didn't hear, correct? They didn't hear no orders, yes. That's correct, your honor. The other ones is the testimony about the vehicle and the alleged carjacking was this what I say was speculation versus reality. There was a special speculation that he was going to carjack. There was no facts to say he was in the vehicle. There is a photo that shows the body of Mr. Langfitt, whether he was in the vehicle or not in the vehicle. Our position was he was not in the vehicle. He did not have a position in the vehicle. He never moved the vehicle. The vehicle wasn't in gear. He never fleed. None of those, right? The issue is he was not, didn't have the, you know, the car in drive and about to head off, but he was inside the vehicle and there was a lot of testimony from saying he darted in, he jumped in the vehicle. That seems to be the key issue here as to whether he was inside the vehicle at the time he was shot. Well, that's what the conflicting testimony is, whether he fell in when he was shot or whether he was in the vehicle. Our position is no, he fell into the vehicle. Miss Power says he fell into the vehicle when he was shot. So that's what she said that in her declaration, but what she said in her statement to the police and what she said during the 911 call and even in her deposition seems to be the opposite. I don't think that her, her declaration says that, Your Honor. I think the declaration says that she, he fell in. Well, that's true. The declaration does say that, but I'm, the question I have is, does that create a genuine dispute of material fact in light of other things that she said and other things that others in this case have said? Well, that's a good question, Your Honor, because then you're going to credibility. Do I believe in other things? That's what the judge was doing, having the credibility and weighing the credibility. A judge is not set for that. That's for the jury. If there's a credibility issue, the Ninth Circuit and all courts have said, that goes to the jury. I believe. Well, but we don't, we don't, we also have case law talking about, you can't put in a declaration later that contradicts what you said earlier. Otherwise, anybody could just get past the summary judgment motion. I think what the courts have said is that what the declaration was self-serving, that there's facts versus conclusions. And here there was facts that Naomi Powers has said, not conclusions. And at that point, they're going to say, that's a credibility issue. Do we believe this person or not? Because it's the same inferences that the court is doing. We'll believe the inferences of Deputy Edwards at this point. That's not the standard of summary judgment. The standard is, you got to look at the inferences, all justifiable inferences for the non-moving party. And that's what we're asking here. In terms of determining the overall reasonableness of the deputy's response to this situation, does it matter whether Billy was in the patrol car or not? Well, yes. Because in the, there's a, the case is a reasonable range, the range of reasonableness. What are the other options? Because at the very beginning, the reason for the call is, there was, he was emotionally disturbed. So was this a welfare in traffic, right? I believe he did run up, he did go up to one vehicle for the window. I believe there was three vehicles. So I don't know if there was running up in traffic. I know there was, and excuse me, I believe there was two vehicles. One was the vehicle he was in with Naomi Powers. Is there a dispute as to whether Billy headed towards the deputy or not? No, there's no dispute that he moved towards the deputy, but then he did pivot. And that's the question, is he then changed direction from the deputy? And one of the questions is, what's the severity of the crime that he was at at this point? Because the reason for the call is, Naomi Powers called and said, my friend is having a mental breakdown. I need help. That's what the reason for the call. So severity of the beginning is, this is the reason for the call. It wasn't for anything else. Well, but I mean, he comes on the scene and he's disturbed and he's doing things to other motorists and other cars also. I don't believe Deputy Edwards saw any of that, Your Honor. When he comes to the scene, he sees Billy outside of the vehicle, I believe. So the officer or Deputy Edwards doesn't know on Also from on the reasonable range that the officers look at, what is the training? Training comes into it. What is the policy state? The policy dictates if somebody's emotionally disturbed, you might want to monitor the situation. You might want to treat them differently. Deputy Edwards knew at the onset this individual was mentally disturbed. So policy take less reasonable means. So at one point, if it's okay if I call him that, Billy is running toward the deputy. I don't know if he ever moved, was running. I know he was. You just told me that he was and then he pivoted. Well, what I want to say is he was approaching and I don't know if it's at a steady gate and then he pivots. So I don't know about whether he was running. I know some of the testimony has said he was running. I know he was moving towards Deputy Edwards. That's what I do know. And I don't know if that's a steady gate or running or any of that. Your honor. That's what the testimony has to come in and say. Well, let everybody testify. What was the physical distance between the deputy and Billy at that time? At that time, I believe some had said more than 50 ft. And at that point, all your arguments is that the deputy could have used a taser? That or the deputy could have stayed in his vehicle where he was safe. He didn't have to come out of the vehicle out of safety. He could have stayed in his vehicle. So are tasers effective beyond about 30 ft? I don't know what your experts say about that. The expert said he could have used lesser force. He could have waited. He could have waited for backup, could have monitored the situation and said taser asked to the specific taser that Deputy Edwards had on that day. I believe your own expert didn't. I didn't know the expert did say he could have used a lesser means, including the taser. Did he comment on the specific type of taser that the deputy had on him at that time and what it what its range was? But I don't recall that right now. Your honor, what the specific range was. Thank you. At that point. The other issue is whether the approach that Deputy Edwards took to your honor how quickly whether he was assessing the situation rather than leaving the car door open. And that's the other thing we said is he left the car door open. There's also policies that Pierce County has secure your vehicle. Don't leave the vehicle open. So here is he's leaving a vehicle unsecured. And then the argument is like, well, he could add access to weapons. Well, Deputy Edwards was the one who left the door open and unsecured. So granting the access to the weapons. So we are hard pressed to say, how can you do both? How can you commence it and leave something like a vehicle open, unsecured and then say, well, yeah, I know I left it open and you could have access to it, but that's not our fault. When your position is that the deputy shot and the shot pushed Billy into the vehicle? My position is yes, the deputy shot and he kept firing. He fired over 10 times and those shots propelled Billy into the patrol car. I would say yes, it could have pushed him into the side of the car. It was the driver's side. Your honor, this is all the driver's side because I believe Deputy Edwards also testified Billy closed the door to the vehicle. The physical evidence says the door is not closed. Could it? His feet are hanging out. How could he close the door? I think he said he started to reach for the door. I think he said he was going to, he closed the door and he was going to flee. That's what the whole point of the carjacking. Because he was going to close the door and he was ready to leave. And we contest that and said, no, he wasn't. He wasn't in the vehicle. And then also about anything about the alleged weapons and them being secured. We also showed physical evidence of the photos of all the buttons in the vehicle. And we even have Sergeant Anderson saying, I don't know how to unlock and unsecure the rifle. You got to push one of the buttons. And she goes, I don't know which one it is. But there was a knife that was unsecured. There was a knife somewhere in the vehicle, but we don't know where in the vehicle. And I don't, I know Billy didn't know where the knife was in the vehicle. So that's the other thing is, and then that goes back to the policy about securing the vehicle. You can't leave your vehicle unsecured. And that's one of the reason the range of reasonable conduct is like other, other lesser alternatives. Did you follow protocol? And I think the court has been clear. It's like, yes, in the ninth circuit, it's like, look, here it is. And then also when you're dealing with a mentally disturbed person, did you give orders? That's something that's in conflict, whether there was orders given. Everybody says we didn't hear any orders. Edward says he, Deputy Edward says I did give orders, but that's conflicting. And that's why that has to go to the jury. Did that happen? Did it not? And does the jury believe? Who are they going to give credibility? Do I believe Ms. Powers or not? So I don't know if the court had any other questions right now. Do you want to save the rest of your time for rebuttal? Yes. Okay. Thank you. Good morning, Your Honors. May it please the court. Crystal Calger for Pierce County and Deputy Colby Edwards. To address some of plaintiffs or Langfords misstatements that contradict the record. First, the county and Deputy Edwards assert that Langford was armed when he jumped in the patrol vehicle and effectively weaponized the vehicle by taking control of it. Witness Gary Taylor said that he saw something in Edwards's hand as he was running. He did not know what it was, but Deputy Edwards did not know what was in Langford's hand either. He just knew he saw something in his hand as he was running toward him and toward the vehicle. The photos that have been submitted and are in the record show Langford in the vehicle. Naomi Powers in the 911 call said that he was sitting in the seat. She said that he dove into the vehicle. He lunged into the vehicle. Gary Taylor said that Langford was running. Witness Kyle Black also said that Langford was running. What does the record show about how close Langford was to Edwards at the time he was running at him and at the time he then essentially pivoted and turned back towards the car? The situation all was fluid and Edwards said that he was within a couple feet of the car when he he exited the patrol vehicle, took a couple steps back to create slight distance and then Langford jumped into the vehicle and Edwards was still there within a close proximity to the vehicle and so that is another fact that we say is not disputed and I guess that plaintiff is misstating what the record shows because the vehicle was not left unsecured. The deputy was standing next to the vehicle armed with his gun drawn so he wasn't leaving his vehicle unsecured. He didn't leave and walk away and not know what was happening. He was guarding his vehicle actively. Was the patrol car or the vehicle in traffic? It was in the roadway and so this was nighttime. It was dark. There were other cars stopped. Witnesses observing in the area as this was all playing out but it was in the roadway as he stopped and addressed the situation because he, Deputy Edwards' testimony was that he pulled you know up to the roadway where this was all occurring and as it was all unfolding stopped his vehicle and then exited as Langford was running toward him. What's your response then to counsel's argument that yes he was in the vehicle but how he got there and how far in he was is a question of fact and is disputed? Your Honor, I don't believe it is a question of fact because as the record shows there's a photograph of him sitting on the seat. This is an SUV, a higher vehicle. It's not something where he's falling in a downward motion. He was up sitting on the seat. We have a photograph of that. Photographs taken after the shooting? After the shooting. We also have Naomi Power's statement to the 911 operator that says he was sitting in the seat and Deputy Edwards says that he was sitting in the seat and Deputy Edwards did not say that he closed the door. He said he was reaching for the door to you know reaching for the door handle in an attempt to close it and that was as he was sitting in the seat and Deputy Edwards also had testified that he was situating himself. He noticed Langford was situating himself in the seat and then attempting to close the door. Can we refine this window and you correct me if I'm wrong. At the point in time was in the vehicle seated in the driver's seat. The other side suggests that he was outside the vehicle and that when the shots happened the force of the shots propelled Langfeld into the vehicle. Have I set that up correctly? Yes, Your Honor and this was a rapidly unfolding situation. It was 11 if I've described this particular window right at that very instant. This is my question. Does it make a difference? Does it just to clarify your question, Your Honor? Does it make a difference whether he was in the vehicle or lunging toward it? I don't believe it does make a difference and in terms of the reasonableness of the deputy's actions. Well, Your Honor and I would say and I have a yes or no or an explanation. Does it make a difference? I don't believe it makes a difference and the evidence does show that he was in the vehicle and that's the records not disputed in what is shown. There's argument. We have argument here from plaintiff that that was what was happening. Your client's position is it doesn't make a difference. It doesn't make a physical distances at the time the shots were fired. What does the record tell us about the physical distance between the deputy and Mr Langfeld? Your Honor, I cannot tell you a physical how many physical feet and I don't believe I don't know what the record shows about the amount of your friend on the other side suggested 50 ft. Does that sound right? I don't believe it was 50 ft. Your Honor, because he was the deputy testified. He took a few steps back to create some distance, but he was still in a close proximity to the vehicle when the shots were fired. So there there may be a question of fact as to whether a lesser form of force, i.e. the opposed to deadly force. I don't believe your honor that that's a material fact at issue here because what we're looking at in for the constitutional force is the reasonableness of the officer on scene. There was an immediate threat to the safety of the deputy and the public surrounding. We know that there are multiple vehicles and multiple citizens on scene as well as the deputy himself positioned around the patrol vehicle. We're looking at, you know, the crimes at issue. When the deputy arrived on the scene, the first thing that he saw was laying fit, pounding on powers his vehicle. We know that Naomi Powers had conveyed to the operator. Well, she was screaming and conveyed that length had pushed her to the ground. And under the record, a reasonable officer could believe that length that was resisting or attempting to evade by flight jumping into the vehicle. And what you just said, I appreciate the argument does not address the question of whether under the facts and circumstances, a lesser form, a lesser form of force could have been employed to stop Mr. Lang fit from doing whatever it was that he was intending to do. Well, your honor, a lesser means is only a consideration of practicable. And we have the case law that tells us when lesser means is available, even if lesser means of force is available, it won't render the conduct of the deputy on the scene unreasonable because all that's required in responding to an exigent situation like we had here is to act within the range of conduct that we identify as reasonable. And the cases that we've cited in our briefing, including the Mullinex v Luna case, a U.S. Supreme Court case that noted where a mentally ill man also attempted to flee in a running patrol vehicle and was shot before he did operate it dangerously. In that case, the court said, we think the police need not have taken that chance and hoped for the best of attempting a lesser force. And so here, even if the lesser force was available to the death to the deputy or potentially would have been available, we don't think it renders the conduct that he, his conduct on scene unreasonable. Well, I mean, even hearing this, though, it does seem, Judge Hawkins asked, you know, does it matter if he was in the car or if he was more kind of heading towards it? And hearing your argument, it does seem that that distinction may matter because if he's in the car, the risk of him leaving with the car, having access to the weapons in the car is way up. And if he's merely outside the car, we're not yet at that at that point. And I do agree, Your Honor. But I think that here what we have is the contemporaneous evidence, the contemporaneous statements of things that are happening on that evening. The only contradiction is Naomi Powers is later declaration in opposition to summary judgment. The audio recording her testimony, the testimony of other witnesses contradict the later declaration that he was never in the vehicle or did not jump into the vehicle. Because as we said, she said on that night, he lunged into the vehicle. He dove into the vehicle. That was her perception when the events were unfolding. Later on, when attempting to avoid summary judgment, then it was, well, he wasn't in the vehicle. He was never in the vehicle. And to the extent that that later declaration seeks to contradict previous testimony, a declaration contradicting earlier deposition testimony does not create a genuine issue of fact. So we had one, her statement to the 911 operator, two statement to the officer the night of the incident, three statement during her deposition, all in line and in agreement. And number four, her declaration. And that is the only time that she contradicts her own prior statements is in her declaration in opposition to the motion for summary judgment. So setting those up just as you've described them, does that permit us to disregard what she said in the affidavit, et cetera, in opposition to the summary judgment? Are, are we permitted to disregard that? I mean, I, yes, because as appellate judges, are we permitted under the case law to say I'm ignoring that? Or do we say to ourselves, this sounds like cross-examination to me? Well, your honor, the case law is clear that contradicting in a declaration previous testimony is not creating a genuine dispute of fact. So I would say, yes, we can't look at that and say, oh, now we have a dispute of fact. We don't because everything before that point was in agreement and then only that later on. So I do believe that that is something that the court can look at and say, this does not. Was she deposed? She was. And was she asked about this contradiction? She was. What did she say? She said that he lunged and dove into the vehicle. And what did she say about the contradiction between her statements at the time and later, her later affidavit in support of the opposition to summary judgment? Oh, I, sorry, I misunderstood your question first. The declaration came after her deposition. So the, she had the statements on the night of the incident. Yes. Thank you. Thank you for that clarification. Appreciate it. What about if we were to, if we, can't make a determination because there is an issue of fact, and I'm not saying there is given her subsequent declaration, but if that were the case, does it come down in some matters to whether does it matter whether he lunged or whether he fell or does that all matter? I mean, looking at one, the constitutional violation, looking at it from the perspective of deputy Edwards, a reasonable officer on the scene, how the events are unfolding and what he's perceiving as we've laid out that his decision to use the force was reasonable. And then in the other aspect, looking at qualified immunity, there's no looking at the facts of this case and what the deputy was confronting. We don't have cases that are holding deadly force under similar circumstances, such as was used here is beyond debate. And we've cited cases supporting that such use was not clearly prohibited under particular circumstances, like in this case. And so I, I believe that looking at the situation that he confronted, number one, not a constitutional violation. And number two, he was entitled to qualified immunity for the situation that he faced because we don't have case law specifically prohibiting that conduct. And here, deputy Edwards's conduct did not violate the fourth amendment because he, and he was entitled to qualified immunity because in this 11 seconds of being confronted by this violent erratic man running toward him with a pointed object in his hand and then jumping into his armed patrol vehicle, he made a reasonable decision under these dense and uncertain circumstances to use deadly force. And the case law clearly did not prohibit at that time, the force that was used. And we asked this court to affirm the lower court's dismissal. Thank you, Ms. Calger. And we'll hear from Mr. Valdez. Your honor, I think I heard the argument that the law was not clearly established, but the ninth circuit has spoken on this in door versus Rutherford about a mentally disturbed individual who is unarmed, who's not given any warnings. And it says it's objectively unreasonable to shoot an unarmed man. Right. But not if, not if the person presents an immediate threat, right? That's, that's the question here. And that's the question here is whether he presents immediate threat or not, because that where he pivoted, did he present, did he then present a threat and a threat to who at that point? Because that's the, that's going to be the question is who's the threat for the safety of the officer or for others or for who, because they're imagining like there was a trap. Why isn't it both? I don't think it's both because the officer was in safety at first when he was in the vehicle, then he removed himself from the safety, right? So he was in safety in the vehicle. He didn't have to get out of the vehicle. He could have stayed in the vehicle the entire time, your honor. But, but that isn't, you know, that's true in every case. You could say, well, if the police never confronted the person, you never would have a confrontation. So that can hardly be the answer. Well, yes, your honor. But that's what I'm trying to say is then the argument that's a circular argument, because then you're saying, well, if he got in the vehicle, he could have injured us. Well, you left the vehicle, you left the vehicle unsecured. So how can you say, well, you don't, don't argue. I mean, the problem that he, I think the record showed that the vehicle was unsecure because he showed up and immediately confronted an active situation, right? He had to, he had to walk back. He had to move backwards quickly because Mr. Langford was essentially running at him. Well, that's where the question is, the reasonable alternatives, reasonable range. Did you assess the situation? That's what our expert has said. Did he assess the situation? Could you have used lesser force? One of the policies says, even in Pierce County, assess the situation, take the time to monitor the situation. You don't have to rush. You don't have to escalate the situation because this is a situation where it could have been escalated. You open the door, leave the car running, leave the keys in, and then you draw your gun. When you know there's a mentally disturbed person, we take issue with that. You could say, look, you didn't have to. There's a reasonable range of alternatives here. This is what the training dictated for you too. And then the question of he dove in or dived in, well, the question is, there's a, people have said he was unarmed. Now you're going to say, well, he was armed. Well, he could have been armed in the future. Well, even if you were getting a vehicle, I think an or versus authority, and they're saying, well, and the Ninth Circuit spoke to this in 2020, did it go to individuals? Did it go towards the officers? Here, we don't even have that. We have this speculation of what would have happened if he would have got the vehicle, if he would have drove the vehicle, if he would, those are ifs. If he had lunged into the car or doved into the car, would you say he presented an immediate threat at that point or he didn't? My argument is, and what I'm saying is, he was already shot before he was in the vehicle. I understand that position, but if he was in the vehicle, if he had doved in and he was lunged into the vehicle, do you think he presented an immediate threat at that point when he's inside the police car, the SUV? Well, and then the SUV is running and the vehicle is on, just like the facts were in this case, correct? I would say there's a possibility where he could have because I don't even know if he knows how to access it because the question is, what's he going to do? Is he going to move the vehicle and take the vehicle or is he not going to take the vehicle? What is he going to do? We don't even know what he's going to do yet, but we are speculating he's going to flee, he's going to hit, he's going to do all these things. What we have to operate is what actually happened and I can understand the argument and I think they said they said of the case, lung, but a lung was different. There was a communication. The individual actually took the vehicle, fleed, moved, and there was a direction here. None of that happened. Can I ask you about the photographs before you conclude? The district court said that the idea that he fell into the seat doesn't make sense because he would have had to fall up given that it was an SUV. How do you address that point? I would address that point to say, look, you're also making another credibility issue. What do you believe? Inferences are drawn to the non-moving party. That's for the jury to decide. You can say the jury could say, okay, we don't, we do, but for the judge, the judge is now making a determination and saying, look, this is the credibility. This is what I believe happened. These are the inferences that I'm going to take. And that's not the standard at this point. The standard is like, what are the justifiable inferences for the non-moving party? All justifiable inferences. And the argument is, is our argument not justifiable? I would say it is. We do have a claim for that. We can say he fell in. If he was 30 feet away and then we said he fell in, okay, then I would say, yeah, that doesn't make sense. How did he fall in the car if he was 30 feet away and shot? How did he fall in the car? That makes sense. Here it's like, no, there's justifiable inference and there's argument to make. He fell in the vehicle. Okay. We want you a little of your time. Let me see if my colleagues have any further questions for you. Oh, sorry. Quite all right. And Mr. Valdez, thank you. Ms. Calgar, thank you. Thank you both for the briefing and argument. This case is submitted. Thank you, your honors.
judges: HAWKINS, McKEOWN, BRESS